**LAWRENCE COUNTY EDUCATION
ASSOCIATION et al.**

v.

**THE LAWRENCE COUNTY BOARD
OF EDUCATION et al.**

Supreme Court of Tennessee,
at Nashville.

June 5, 2007 Session.

Dec. 20, 2007.

Richard L. Colbert and J. Christopher Anderson, Nashville, Tennessee, for the appellants, Lawrence County Education Association and Jerry Taylor.

Paul B. Plant and J. Christopher Williams, Lawrenceburg, Tennessee, for the appellees, Lawrence County Board of Education and Larry Morrow, Director of Schools.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and CORNELIA A. CLARK, JJ., joined.

Jerry Taylor, a tenured teacher in Lawrence County, and the Lawrence County Education Association brought this action against the Lawrence County Board of Education, primarily seeking the reinstatement of Taylor's additional role as head girls' basketball coach at Loretto High School but also asking for other relief. Both sides filed motions for summary judgment. After granting the motion filed by Taylor and the Education Association, the judge approved back pay for 2001–2002, ordered that Taylor should have been considered as the incumbent coach for 2002–2003, and directed pay for that year as well. The judge declined to reinstate Taylor as coach. The Court of Appeals affirmed the judgment but ruled that

teacher transfers, including the reassignment of a coach to full-time teaching responsibilities, were within the exclusive authority of the director of schools and not a proper subject of the collective bargaining process. We granted review to determine what remedies, if any, were available to Taylor and the Education Association.

We hold that the director of schools has the statutory authority to "transfer" teachers, including the re-assignment of a tenured teacher with coaching responsibilities to a full-time teaching position when necessary for the efficient operation of the system; however, the subject of teacher transfer may be addressed in the collective bargaining process under our statutes, and the powers of a director in that regard are subject to both the terms of any contract and to board policy. Nevertheless, the director retains the power to transfer a tenured teacher as to their coaching responsibilities, without regard to the terms of a collective bargaining agreement, so long as that transfer does not affect the employee's position as a teacher. This is because a coach does not fall under the statutory definition of a "professional employee." While Taylor, in his capacity as coach, was not entitled to an arbitration hearing on his transfer from coaching under the collective bargaining agreement, the board of education, by adopting the recommendations of the arbitrator, established a policy granting rights to Taylor which he would not have otherwise possessed.

Because the binding nature of the arbitrator's decision is not in dispute, Taylor is entitled to a partial summary judgment in that he should receive the coaching supplement for the school year 2001–2002 and should have been treated as the "incum-

bent coach" for assignment purposes in 2002–2003. In that regard, the judgment is affirmed. There are, however, genuine issues of material fact as to whether Taylor, despite his incumbency status, was properly transferred to a full-time teacher in 2002–2003 in accordance with statutory guidelines; therefore, the award of the coaching supplement for that school year must be set aside, and the cause is remanded for trial as to whether the transfer was arbitrary, capricious, or the subject of improper motivation, as prohibited by law. Any entitlement to the coaching supplement for 2002–2003 or other remedy depends upon the propriety of the transfer under the statute and under the collective bargaining agreement, as modified by the board's action.

## I. Factual and Procedural Background

Jerry Taylor, a tenured public school teacher at Loretto High School ("Loretto") in the Lawrence County School System, served as the head basketball coach for the school's girls' team from 1984 until 2001. David Daniel ("Principal") served as Loretto's principal. During the spring of 2001, a number of the parents of Taylor's players complained about his behavior to both the Principal and certain members of the Lawrence County Board of Education ("BOE"). A petition that sought Taylor's removal was circulated in the community and was signed by a substantial number of "concerned citizens of Lawrence County." According to Director of Schools Larry Morrow ("Director"), the players and their parents met with the Principal and the BOE's attorney, Charles W. Holt, Jr., to discuss the nature of the complaints. There were three allegations of substance: (1) the use of profanity and inappropriate, "sexually suggestive" remarks in the presence of the players; (2) the possible mistreatment of a player who otherwise had a

chance at a college athletic scholarship; and (3) the use of racial slurs. The record indicates that seventeen parents and students made statements critical of Taylor, all of which were transcribed by a court reporter, and that after the session, the Principal met with the Director and the BOE attorney and recommended that Taylor be removed as coach. The record also indicates that Taylor's teams had impressive records during his tenure but that there had been a history of controversy about the way he treated players. For example, during each year of his coaching career at the school, complaints similar to those made in the latter part of the 2000–2001 school term had been lodged against Taylor.

In the summer of 2001, the Principal and the Director proposed that Taylor consent to a "Memorandum of Understanding," which established standards of conduct as an alternative to his possible dismissal as coach. Taylor, after receiving assurances from the Principal and Director that they would conduct a "fair and impartial hearing" on the complaints against him even if he chose not to sign, declined to execute the agreement. Shortly thereafter, the Principal notified Taylor that while his status as a tenured teacher was unaffected, he would not be assigned as the girls' basketball coach for the 2001–2002 school year. Christy Green, a South Lawrence Middle School teacher, was named to the position.

In the following month, Taylor, a member of the Lawrence County Education Association ("LCEA"), filed a grievance under a collective bargaining agreement ("Master Contract") made pursuant to the provisions of the Education Professional Negotiations Act ("EPNA"). Tenn.Code Ann. § 49–5–601 (2002). He alleged nine violations of the Master Contract. After a lack of success in the grievance procedures

before the Principal, the Director, and the BOE, Taylor sought and received an arbitration hearing pursuant to the terms of the Master Contract before arbitrator Robert N. Covington, a Vanderbilt University law professor. During that proceeding, the Director explained that he dismissed Taylor as coach because of the controversy surrounding his employment, his use of profanity, and the racial slurs made in the presence of players. The arbitrator, whose recommendations were advisory by the terms of the Master Contract, entered the following findings:

(1) the Master Contract covers coaching assignments;

(2) any effort to relieve Mr. Taylor of the coaching assignment must comply with the Master Contract because the assignment as the girls' basketball coach constituted a "professional advantage" and the relinquishment of the position under these circumstances constituted "discipline;"

(3) the Master Contract required an investigation with Mr. Taylor's participation, inclusion of material in Mr. Taylor's personnel file forming the basis of any adverse action, and a written statement of reasons for decisions made in the grievance process;

(4) the Board failed to comply with the requirements of the Master Contract listed above, and the failures to comply with these procedural requirements prejudiced Mr. Taylor; and

(5) the decision to remove Mr. Taylor as the girls' basketball coach was arbitrary and capricious because either the proof was lacking or loss of the coaching position was disproportionate to the offense.

In his award, the arbitrator concluded that Taylor should be paid the coaching supplement for the school year 2001–2002, that he should be considered the incumbent coach when the Director made the personnel assignments in 2002–2003, and that the Director should disregard the complaints that led to Taylor's removal as coach. The arbitrator expressed the belief that he lacked the authority to order reinstatement on a permanent basis "without the [Director] as the primary moving party" and observed that if the Director chose not to name Taylor as coach in 2002–2003, "the probability that another grievance will be filed is high."

Because the BOE, on June 18, 2002, unanimously accepted the arbitrator's recommendations and agreed to be bound by his determination, the correctness of the decision is not at issue. While Taylor was granted back pay for the coaching supplement for 2001–2002, the Director chose Green, the 2001–2002 replacement coach, over Taylor for the 2002–2003 school year. In making the decision, the Director maintained that he had considered Taylor as the incumbent coach and had disregarded the 2001 complaints as recommended by the arbitrator. He chose, however, to appoint Green "for the most efficient operation of Loretto High School." See Tenn. Code Ann. § 49–5–510 (2002) (authorizing directors of schools to transfer teachers "when necessary to the efficient operation of the school system").

Afterward, Taylor, rather than lodging another grievance for 2002–2003,[2] filed this lawsuit in conjunction with the LCEA, seeking his reinstatement as coach. They first alleged that the Director breached the grievance provision of the Master Contract by failing to follow the arbitrator's findings, which, they argue, had become binding when adopted by the BOE. Secondly, they alleged that Taylor's removal

2. If a grievance was, in fact, filed on behalf of Taylor for any years after 2001–2002, nothing in the record indicates the status of the procedure.

as coach was arbitrary and capricious and violated statutory teacher tenure protections. The Director, who was joined by the BOE, resisted the claim and filed a counterclaim seeking approval of the actions. Taylor and the LCEA filed a motion for summary judgment as did the Director and the BOE.

While acknowledging that some facts were in dispute, the judge described them as insignificant and, in 2004, granted the motion for summary judgment filed by Taylor and the LCEA, concluding that the BOE had "accepted and agreed to be bound by the arbitrator's decision which granted ... Taylor certain rights that he might not have otherwise had under Tennessee law or the master contract." The judge also found that the Director was "obligated ... to assume that ... Taylor was the incumbent head coach ... and to disregard the complaints against [him] which were the subject of a petition and investigation in early 2001." Further, the judge determined that because the Director had relied upon parental complaints and had failed to properly consider Taylor as the incumbent, the Director's decision to hire Green in 2002–2003 violated the "letter and spirit" of the arbitration results thereby entitling Taylor to a coaching supplement for that school year as well. Finally, the judge observed that the arbitrator's decision did not extend beyond the 2002–2003 school term and that Taylor had the obligation to file additional grievances in order to preserve any future rights.

In reality, the grant of summary judgment by the judge was only partial because Taylor was denied reinstatement as coach.[3] The motion for summary judgment by the Director and the BOE was denied.

In the direct appeal, Taylor and the LCEA contended that the chancery court should have ordered reinstatement, erred by confining its judgment to the 2002–2003 school year, and mistakenly determined that Taylor was required to file another grievance to protect his rights in the ensuing years. The BOE and the Director did not appeal the judge's ruling. The Court of Appeals affirmed, concluding that the judge had accurately framed the issue as whether the arbitrator's decision, as adopted by the BOE, limited the discretion of the Director beyond the 2002–2003 school year. The intermediate court concluded that the BOE and the Director, rather than Taylor and the LCEA, were "entitled to summary judgment" because Taylor "had not established any rights ... to a coaching assignment for any year past 2002–03" and "had no claim beyond that created ... by the Board's approval of the arbitration decision." To the further disappointment of Taylor and the LCEA, the Court of Appeals also ruled that "even if the arbitrator's decision extended beyond" 2002–2003, only the Director had the authority to make the appointment and not the arbitrator. Stated differently, the Court of Appeals concluded that the board of education had no power to enter into a collective bargaining agreement with an education association that purported to modify or remove the power of a director "to make employee assignments and transfers." By footnote, the Court of Appeals commented that under current law, a school board has no authority to transfer employees.

After an unsuccessful petition to rehear in the Court of Appeals, Taylor and the LCEA applied for permission to appeal, contending that transfer authority is a proper subject of negotiation, that the Di-

---

**3.** Taylor was denied a preliminary injunction for reinstatement on November 26, 2002. He was not the coach in the 2002–2003 or 2003–2004 school year.

rector and the BOE breached their negotiated contract, and that there should be remedies available. This Court accepted the application to determine the extent of the authority of the Director with regard to Taylor's transfer from coach to a full-time teaching position in the context of teacher tenure, the collective bargaining agreement, the arbitrator's decision, and the approval of that decision by the BOE.

## II. Standard of Review and Statutory Construction

■ This lawsuit was decided on competing motions for summary judgment. In our review, we are guided by a variety of well-established principles. Initially, a trial court's grant of a motion for summary judgment presents a question of law that we review de novo without a presumption of correctness. *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn.2001). Summary judgment should be granted only when there are no genuine issues of material fact and a judgment is warranted as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn.2001). If the material facts are undisputed, the interpretation and application of legislative enactments present questions of law unaccompanied by any presumption of correctness. *Billington v. Crowder*, 553 S.W.2d 590, 595 (Tenn.Ct. App.1977). A question of law is, therefore, subject to de novo review. *Leab v. S & H Mining Co.*, 76 S.W.3d 344, 348 (Tenn. 2002); *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn.2000).

■ There are also issues that require statutory interpretation. In construing legislative enactments, we presume that every word in a statute has meaning and purpose; each word should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722

(Tenn.2005). "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn.2004). In that instance, our obligation is to enforce the written language without reference to the broader statutory intent, the history of the legislation, or other sources. *Abels v. Genie Indus. Inc.*, 202 S.W.3d 99, 102 (Tenn.2006). When the language is ambiguous and does not yield a clear interpretation, courts may consult the legislative history for additional guidance. *Storey v. Bradford Furniture Co.*, 910 S.W.2d 857, 859 (Tenn.1995); *Carr v. Ford*, 833 S.W.2d 68, 69 (Tenn.1992). Statutes *in pari materia*—in other words, statutes "relating to the same subject or having a common purpose"—should be construed together, and the construction of one may be used to help resolve ambiguity in another. *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn.1994). In summary, "[t]he cardinal rule of statutory construction is to effectuate legislative intent, with all rules of construction being aides to that end." *Browder v. Morris*, 975 S.W.2d 308, 311 (Tenn. 1998).

## III. School Governance and Teacher Transfer

### A. Legislative History

A primary issue is whether transfer authority over school personnel is a proper subject of negotiation in the collective bargaining process between a board of education and an Education Association. Our efforts are designed to generally determine the extent of the authority of a director of schools over tenured teachers and especially those tenured teachers with

coaching responsibilities.[4]

Article II, section 3 of our state's constitution confers upon the General Assembly the entirety of the legislative function, including the power and authority over public education.[5] *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706 (Tenn.2001). The administration of public education is set out in Tennessee Code Annotated. Tenn.Code Ann. § 49–1–101 to –50–1509 (2002 & Supp. 2007). The first chapter addresses the role of the state, and chapter two provides for the local administration of public schools.

As a part of the state's system of education and local administration, county boards of education, as elected by the people, Tennessee Code Annotated section 49–2–201 (Supp.2007), have the duty and power to manage and control the public schools within their jurisdictions. Tenn. Code Ann. § 49–2–203 (2002 & Supp.2007). Among those enumerated duties is the responsibility of the boards to elect teachers for tenure, fix salaries, and enter contracts. Tenn.Code Ann. § 49–2–203(a) (Supp.2007). Prior to 1992, a popularly elected superintendent of schools and the local board shared the authority for the placement of personnel. More specifically, Tennessee Code Annotated section 49–5–510 (1990), a part of the Teacher Tenure Act, required the approval of the board for the superintendent to transfer a teacher within the system from one school to another or from one job to another.

In 1992, the Educational Improvement Act ("EIA") implemented a corporate model of governance and replaced the elected superintendent position with a director of schools, appointed by and answerable to the board. Tenn.Code Ann. § 49–2–301 (2002 & Supp.2007); 1992 Tenn. Pub. Acts ch. 535. By virtue of this legislation, the duties now allocated to the director include, among other things, the assignment of teachers and recommendations for tenure and salaries. *Id.* at 301(b)(1). The director is empowered under the EIA "to employ, transfer, suspend, non-renew and dismiss all personnel" within the school system, subject only to limited restrictions. *Id.* at 301(b)(1)(EE) (2002 & Supp.2007). Further, as a part of the tenure section, the director is authorized,

---

**4.** The Court of Appeals has dealt with similar issues. In *Metropolitan Nashville Education Ass'n v. Metropolitan Board of Public Education*, No. M2005–00747–COA–R3–CV, 2006 WL 2619982 (Tenn.Ct.App. Sept.12, 2006), the court held that an arbitrator charged with determining whether a teacher was properly transferred to a different school could also legally restore the teacher to a previously-held coaching position, notwithstanding the decision by the Director of Schools not to renew the individual's contract for the coaching position. Judge Kirby dissented and opined that the arbitrator's decision to mandate the renewal of a coaching contract as part of the arbitration resulted in the arbitrator considering, as part of his arbitration determination, a contract that did not exist, and that the relevant statutes did not permit a decision not to renew a coaching position to be a subject of arbitration in the collective bargaining agreement. In *Marion County Board of Education v. Marion County Education Ass'n*, 86 S.W.3d 202, 214 (Tenn.Ct.App.2001), the court held as unauthorized by law a collective bargaining agreement which allows substituting the arbitrator's judgment for the discretion of the director of schools in selecting principals.

**5.** A miscellaneous provision in our constitution adopted in 1978 more specifically addresses education: "The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools...." Tenn. Const. Art XI, § 12. In *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d 139, 140 (Tenn.1993), this court confirmed the constitutional duty of the General Assembly to provide a free public school system.

"when necessary to the efficient operation of the school system, [to] transfer a teacher from one location to another ... or from one type of work to another for which the teacher is qualified and licensed." Tenn.Code Ann. § 49–5–510 (2002); *see Springer v. Williamson County Bd. of Educ.*, 906 S.W.2d 924, 926 (Tenn.Ct.App. 1995).[6]

In 1978, prior to the enactment of the EIA, the legislature adopted the EPNA, authorizing local boards of education to negotiate with recognized professional employees' organizations. The legislation empowered teachers to bargain collectively with the boards regarding the terms and conditions of their professional service. Tenn.Code Ann. §§ 49–5–601 to –13 (2002 & Supp.2007). While the board and any Education Association, by the terms of the EPNA, must conduct good faith negotiations on the issues of salaries and wages, grievance procedures, insurance, fringe benefits, working conditions, leave, student discipline procedures, and payroll deductions, the EPNA provides that "[n]othing shall prohibit the parties from agreeing to discuss other terms and conditions of employment in service." Tenn.Code Ann. § 49–5–611(b) (2002). The EPNA also recognizes as unmodified "[t]hose rights and responsibilities of boards of education, directors of schools and professional employees as contained in this title." Tenn. Code Ann. § 49–5–604(a) (2002). The scope of the bargaining may "extend to all matters negotiated," but must not conflict with federal, state, or local laws, or the rights of either the board of education or the professional employees as defined by EPNA. Tenn.Code Ann. §§ 49–5–611 to – 612 (2002).

While nothing in the EIA limits the authority of the local board of education or the power of teachers to negotiate collectively under the EPNA as to issues within their control, the EIA vests in the director certain powers that previously had been reserved for the board or had required joint approval of the board and the superintendent. *See Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 60 S.W.3d 65, 70 (Tenn.Ct.App.2001).[7] As indicated, one of the statutory provisions pertaining to tenure empowered the director to transfer teachers "within the school system." Tenn.Code Ann. § 49–5–510 (1996).[8]

## B. Attorney General Opinion and Legislative Response

In 1997, the attorney general issued an opinion stating that because the EIA had given the director exclusive authority over transfers in Tennessee Code Annotated section 49–5–510, local boards could not enter into a negotiated agreement authorized by the EPNA "bargain[ing] away the [director's] authority to transfer teachers." Tenn. Op. Atty. Gen. No. 97–107. After an analysis of the applicable statutes, particularly Tennessee Code Annotated sections 49–2–301(f)(31) (1998) and 49–5–510 (1998),

---

6. The term "teacher" includes teachers, principals, supervisors, directors of schools and the other certified personnel in public elementary and secondary schools. Tenn.Code Ann. § 49–5–501(10) (2002).

7. In this case, the Court of Appeals held that under the EIA, principals negotiate with the director regarding matters related to performance, accountability, and contract renewal. Education Associations may not negotiate these matters with the school boards on be-

half of the principals, but the other conditions of a principal's employment are still within the prerogative of the local school boards, even under the EIA.

8. "Administrative and supervisory personnel ... have tenure as teachers and not necessarily tenure in the ... position in which they may be employed...." Tenn.Code Ann. § 49–5–501(11)(A).

the opinion concluded that any collective bargaining agreement seeking to limit the director's authority to transfer "would violate state law and be a nullity." *Id.*

In 1998, and in response to the opinion issued by the attorney general, the General Assembly passed legislation amending both Tennessee Code Annotated section 49–2–301(f) and Tennessee Code Annotated section 49–5–510. The amendments added provisions on the subject of transfers to assure director compliance with contracts authorized by the EPNA.

The first section of the legislation, approved April 28, 1998, re-stated Tennessee Code Annotated section 49–2–301(f), in reference to the assigned duties of the director:

> Within the approved budget and *consistent with existing state laws, board policies and locally negotiated agreements* covering licensed personnel, *to employ, transfer, suspend, non-renew and dismiss all personnel,* licensed or otherwise, except as provided in Section 49–2–203(a)(1) and in Chapter 5, Part 5 of this title. *Nothing in this subdivision shall be construed to alter, diminish, or supersede the Educational Professional Negotiations Act, Tennessee Code Annotated, Title 49, Chapter 5, Part 6.*[9]

(emphasis added). The second section of the legislation preserved the director's authority to "transfer a teacher from one location to another . . . or from one type of work to another for which the teacher is qualified and licensed" but replaced a period with a semi-colon after the word "licensed" and added the following condition: *"provided that transfers shall be acted upon in accordance with board policy and any locally negotiated agreement."* Tenn. Code Ann. § 49–5–510 (2002) (emphasis added).

Prior to the amendments, Tennessee Code Annotated section 49–2–301(f)(31) had required boards of education to assign to their directors, the duty to "[e]mploy, transfer, suspend, non-renew, and dismiss all personnel within the approved budget, except as provided in § 49–2–203(a)(1) and in Chapter 5, Part 5 of this title." That was changed, however, to assure that the authority granted by the EPNA was unaffected by the EIA as to teacher transfers. Tenn.Code Ann. § 49–2–301(b)(1)(EE). Similarly, the section of the new legislation pertaining to tenure made transfers of teachers subject to compliance with board policy and the local contract. Tenn.Code Ann. § 49–5–510 (2002). The history accompanying the 1998 amendments includes a comment by the chairman of the Senate Education Committee explaining its purpose:

> There has been an Attorney General's opinion which had brought question upon our intent in 1992 [when the EIA was passed] concerning part of what all is involved in the negotiation process. What this will do is clarify the intent in 1992 . . . which *includes transfer and makes it part of a negotiable item in the negotiation process as it was prior to 1992.* [March 25, 1998, Senate Education Committee hearing on Adoption of S.B. 2172 (Tenn.1998).]

(emphasis added). The house sponsor of the bill made similar comments prior to its passage. *See* March 31, 1998, House Education Committee Hearing on Adoption of H.B. 2750 (Tenn.1998).

In 2001, the Court of Appeals addressed the issue of transfer as it applies to principals. *Marion County Bd. of Educ. v. Marion County Educ. Ass'n,* 86 S.W.3d 202, 208 (Tenn.Ct.App.2001). While interpreting Tennessee Code Annotated section

---

**9.** This has been re-codified as Tennessee Code Annotated section 49–2–301(b)(1)(EE).

49–2–303(a)(1) (1996), a part of the EIA pertaining to school principals in the context of a transfer under Tennessee Code Annotated section 49–5–510, the Court of Appeals specifically held that a collective bargaining agreement which "envisions substitution of the judgment of an arbitrator for discretion of the director of schools in the selection of principals is not authorized by law." *Id.* at 214. The court reasoned that the legislatively enumerated duties and powers of a director to transfer principals could neither be discussed nor negotiated away in a collective bargaining process. *See also Carter County Bd. of Educ. v. Carter County Educ. Ass'n,* 56 S.W.3d 1 (Tenn.Ct.App.1996), *perm. app. denied,* (Oct. 7, 1996) (determining that the statutory duty to elect a principal is non-delegable and is not an issue subject to collective bargaining). Although its opinion made no reference to the legislative history surrounding the adoption of the 1998 amendments, the Court of Appeals acknowledged the wording of the new provisions but determined that other parts of the EPNA had demonstrated an intent not to modify the "rights and responsibilities" of the board and the superintendent (or director) in regard to the position of principal. Tenn.Code Ann. § 49–5–604; *Marion County Bd. of Educ.,* 86 S.W.3d at 208. Our intermediate court interpreted the EPNA as prohibiting the scope of the negotiated agreement from reaching the "[b]oard of education rights," as set out in Tennessee Code Annotated sections 49–5–611 and 612(a)(3), and as subsequently transferred to the director of schools by the EIA. *Id.* at 209 & n. 11.

 In this case, we must address the 1998 amendments, not in the context of the transfer of a principal, but as to their effect on a tenured teacher whose coaching responsibilities have been specifically addressed by the board of education. In matters of statutory construction, our role is to ascertain the legislative intent from the natural and ordinary meaning of the language used. *Roddy,* 661 S.W.2d at 871. Further, when the language presents any ambiguity, we may consider legislative history for guidance. *Storey,* 910 S.W.2d at 859. Whether plain by the terms of the amendment or, if sufficiently unclear by its terms to warrant resorting to the legislative history, our interpretation of the amendments is the same: The General Assembly intended to assure that the authority of the director to transfer tenured teachers, including those who simultaneously hold coaching positions, is subject to board of education policy and the terms of the locally negotiated contract. These requirements necessarily imply that the General Assembly intended to allow boards of education to enter into collective bargaining agreements that regulate the transfer of tenured teachers by a director. In our view, no other construction of the statute gives effect to the language, "transfers shall be acted upon in accordance with board policy and any locally negotiated agreement."

A separate amendment adopted in 2002 buttresses the accuracy of our interpretation. Our General Assembly passed Public Acts Chapter 683, Senate Bill No. 467 amending Tennessee Code Annotated section 49–5–601(b):

> Notwithstanding other provisions of [Title 49] to the contrary, directors of schools shall have the ultimate right to transfer all *professional employees* subject only to [sections] 49–2–303 and 49–5–510. *Nothing in this section shall be construed to make transfers or assignments mandatory subjects of negotiations.*

Tenn.Code Ann. § 49–5–601(b)(5) (2002) (emphasis added). By declining to mandate negotiations on teacher assignment or

transfer, our legislature underscored its desire to permit discussions on the subject.

In this context, it is our conclusion that the legislature, by the passage of the 1998 and 2002 amendments, confirmed the traditional powers of the board of education to establish policies and to negotiate the issue of teacher transfer on a local basis. The subject of transfer *may* be addressed in the collective bargaining process, but only on a discretionary basis. Neither the county boards of education nor any local Education Association are compelled to address the subject. We hold, therefore, that the director's authority to make transfers of tenured teachers within the system may be modified by board policy or by the locally negotiated agreement, as provided by statute.

## IV. Challenges to Teacher Transfer

■■■ The term "teacher," under the Teacher Tenure Act, includes "teachers, supervisors, principals, director of schools, and all other certified personnel...." Tenn.Code Ann. § 49–5–501(10) (2002). The term has been broadly defined for tenure purposes to include tenured teachers with coaching duties. *See, e.g., Davis v. Barr*, 373 F.Supp. 740, 746 (E.D.Tenn. 1973). Traditionally, a tenured teacher with athletic coaching responsibilities has or may have two separate, but related, rights in regard to employment. In *White v. Banks*, 614 S.W.2d 331, 334 (Tenn.1981), where a teacher was retained as a teacher but relieved of coaching duties, this Court recognized those rights as statutory and contractual: "(1) his position as a teacher is protected by tenure [status] ... and, (2) his position as a coach is protected by whatever contract he has with the board to perform coaching duties, but not by tenure." White was denied back pay and reinstatement. *Id.* It is of importance that

in that case, this Court observed that "[t]here is no certification of coaches ... in Tennessee." *Id.* at 332.

## A. By Statute

■■■ As stated, a director of schools has the statutory power to transfer teachers within the local system. Tenn.Code Ann. § 49–5–510 (2002). "When so made, it need not necessarily be preceded ... by formal written notice and a hearing, so long as it is made in good faith, in accordance with the criterion set forth in the statute—efficient operation of the school system." *McKenna v. Sumner County Bd. of Educ.*, 574 S.W.2d 527, 534 (Tenn. 1978); *see also State ex rel. Pemberton v. Wilson*, 481 S.W.2d 760, 770 (Tenn.1972). If a transfer is not made in good faith and is the product of arbitrary, capricious, or improper conduct, a tenured teacher is entitled to present a direct legal challenge in the courts. *McKenna*, 574 S.W.2d at 534; *Mitchell v. Garrett*, 510 S.W.2d 894, 898 (Tenn.1974). Judicial review is limited to determining "whether or not a transfer was made in accordance with the statutory requirements .... and must be conducted in light of the broad discretion which the statutes clearly give." *McKenna*, 574 S.W.2d at 534 (referencing Tenn.Code Ann. § 49–1411 [10]).

■■■ A shift of a tenured teacher with athletic coaching duties to a full-time teaching position, one type of work to another, has typically been classified as a transfer and not a "dismissal or suspension." *White*, 614 S.W.2d at 334. In *White*, a tenured teacher who had been discharged as head basketball coach filed suit, contending that he had been "demoted." This Court ruled that "[r]elieving a teacher-coach of his coaching duties only ... is equivalent to a 'transfer within the

---

**10.** Now found in Tenn.Code Ann. § 49–5–510.

system,'" as authorized by statute, but denied relief. *Id.*

Similarly, the holding in *Warren v. Polk County Board of Education,* 613 S.W.2d 222 (Tenn.1981) is instructive as to the historical meaning of "transfer." A tenured teacher, although retained in his teaching capacity, was relieved of his duties as athletic director and coach and, in consequence, did not receive the coaching supplements that accompanied those positions. While recognizing Warren's right to directly challenge his transfer under the applicable statute, this Court held as follows:

> The position of athletic director and coach is an assignment that falls within the same category as principal and other administrative and supervisory assignments. *Tenure cannot be acquired in that status,* and there is no requirement of formal charges and a hearing prior to relieving a tenured teacher of that assignment.

*Id.* at 225 (emphasis added). In its concluding paragraph, this Court ruled that Warren "had the burden of proof," but failed "to establish by a preponderance of the evidence that the action of . . . relieving him of the duties of athletic director and coach was arbitrary, capricious, or improperly motivated." *Id.* at 226.

■ Subject to these constraints, Taylor, as coach, was entitled to present a direct challenge under statute questioning the propriety of his transfer from a teacher with coaching responsibilities to a full-time teaching position.[11] The determinative question is whether the transfer could be classified as for the "efficient operation of the school system." There is a presumption of good faith associated with

teacher transfers. *McKenna,* 574 S.W.2d at 530. Taylor, in order to qualify for relief beyond those years not in dispute, has the same burden Warren had—to prove the transfer was arbitrary and capricious. *Id.* at 534.

## B. By Contract

■ In addition to his claim under statute, Taylor and the LCEA assert a cause of action under a contractual theory. As stated, teacher transfer may be a proper subject of negotiation in the collective bargaining process. The more significant question here is whether an arbitration clause in a negotiated agreement reached pursuant to the EPNA applies not only to tenured teaching duties but coaching responsibilities as well.

The collective bargaining agreement between the Board and LCEA was entered into pursuant to the EPNA. The act is designed "to prescribe the legitimate rights and obligations of boards of education and their *professional employees.*" Tenn.Code Ann. § 49–5–601(b)(1) (emphasis added). Tennessee Code Annotated section 49–5–603 bestows upon "professional employees" entitlements "to self-organization, to form, join or be assisted by organizations, to negotiate through representatives of their own choosing, and to engage in other concerted activities for the purpose of professional negotiations." Tenn.Code Ann. § 49–5–603.

The EPNA defines "Memorandum of agreement" as "a written memorandum of understanding arrived at by the representatives of the board of education and a recognized *professional employees'* organization, which shall be presented to the

---

11. Tennessee Code Annotated section 49–2–301(FF), a part of the EIA, provides that "[a]ll persons who are employed in a position for which no teaching license is required shall be hired on a year to year contract. The director shall provide a person fifteen (15) days notice of non-renewal of the contract before the end of the contract period."

board of education and to the membership of such organization for ratification or rejection." Tenn.Code Ann. § 49–5–602(6) (emphasis added). The term *"professional employee"* is defined as "any person employed by any local board of education in *a position which requires a license issued by the department of education."* Tenn. Code Ann. § 49–5–602(11) (emphasis added). Tennessee Code Annotated section 49–5–612 explains that the "scope of a memorandum of agreement shall extend to all matters negotiated between the board of education and the *professional employees'* organization; provided, that the scope of such agreement shall not include proposals contrary to ... professional employee rights," among other things. (emphasis added).

Clearly then, the statutory protections of the EPNA are limited in their application to "professional employees." Principals, teachers, and supervisors must possess a valid license from the Tennessee Board of Education as a pre-requisite for employment in a local school system. Tenn.Code Ann. § 49–5–101(a) (2002); Tenn.Code Ann. § 49–5–108 (Supp.2007). "No person shall be employed to teach ... or receive pay [without] ... a license from the commission or state board...." Tenn. Code Ann. § 49–5–403(a). Conversely, nowhere in the EPNA is it stated that its protections and guidelines apply to non-professional or non-licensed positions. Coaching and equivalent positions in public elementary or secondary schools do not require such a license in the same regard as the teaching profession. Our interpretation, therefore, is that any contractual protections emanating from the EPNA are relevant to persons only in their status as

professional employees and not in their status in non-licensed positions.

Our construction of the EPNA is consistent with the specific language of the Master Contract in Lawrence County, which covered the period between July 1, 2000 and June 30, 2003. The agreement "prescribe[s] the legitimate rights of the Board of Education's *professional employees* to establish procedures which are designed to meet the special requirements and need of public education." Area I, Article II defines the phrase "professional employee" as including "any personnel employed by the Board in a position which requires a certificate issued by the State Department of Education for service in public elementary and secondary schools of Tennessee supported, in whole or in part, by local, state, or federal funds." The terms "teacher" and "employee" are defined as "any person included in the negotiating unit."

The "Grievance Procedure" section, found in Area I, Article V, states that a " 'Grievance' shall mean any claim by a teacher or the Association that there has been a violation, misinterpretation, or misapplication of the terms of this agreement." The grievance procedures and appropriate steps are then thoroughly addressed. The fourth step of the procedure explains, in part, that an arbitrator "shall have no power to alter the terms of [the] agreement."

Area III, Article 4 of the Master Contract speaks to the subject of teacher transfer under the caption "Vacancies, Transfers and Reassignments." The terms require the Director,[12] if requested, to offer reasons for a transfer and establish that those "transfers recommended by [a] principal should be neither arbitrary

---

**12.** Although the Master Contract uses the title "superintendent" instead of "director," we interpret those titles as interchangeable, pur-

suant to the EIA. Tenn.Code Ann. § 49–2–203(a)(15)(A) (2002).

nor capricious," as is the traditional scope of review under the statutory law. *See* Tenn.Code Ann. § 49–5–510 (2002); Tenn. Code Ann. § 49–2–301(FF). The "Transfers and Reassignments" section states that "[i]f an administrative request for a transfer is made, the superintendent shall offer reasons why the transfer was necessary, if requested by the teacher." It further mandates that transfers cannot be made for "arbitrary or capricious reasons."

Subsequent paragraphs, Area V, Articles 2 and 3, pertain to the personnel file of and complaints against a teacher, setting out procedural guidelines for the investigation of complaints. Further, the "Due Process" section of the agreement at Area V, Article 4(c) provides that "[n]o *tenured* teacher shall be discharged, non-renewed, suspended, reduced in rank or compensation or deprived of any professional advantage without just cause." The term "professional advantage" is not defined.

Coaches and/or coaching positions are referenced in two places in the Master Contract. As to salary and benefits, "Coaches' and Band Directors' Supplements shall be paid in accordance with [their] supplement schedule. (Appendix C)." Appendix C provides that supplements for coaches will be calculated as a percentage of total salary. Otherwise, no language in the Master Contract grants any particular rights to coaches.

As stated, the arbitrator[13] in this instance ruled that the terms of the Master Contract applied to Taylor, that coaching duties qualified as a "professional advantage," an obviously arguable point under the contractual terms, and that any removal of those duties qualified as a disciplinary action. The arbitrator also ruled that the failure on the part of the Director to assign coaching responsibilities in 2001–2002 and to treat Taylor as the incumbent for the following year was without an appropriate basis.

■ We interpret the EPNA and the Master Contract differently than did the arbitrator. Both the contractual terms, with numerous references to "professional employee," and the provisions of the EPNA lead us to conclude that the collective bargaining agreement between the LCEA and the BOE, including the arbitration clause, does not apply to the coaching aspect of a tenured teacher's employment.[14] Thus, Taylor's coaching status was not covered by the Master Contract and instead was governed by a series of one-year terms, applicable to all positions for which no license is required, as prescribed by law. *See* Tenn.Code Ann. § 49–2–301(b)(1)(FF). This statute specifically confers on the director of schools the authority to hire persons for which no teaching license is required and limits the term of employment. Tenn.Code Ann.

13. While the contractual provisions declare that an arbitrator's decision is binding unless "rejected by a majority vote of the membership of the Board", the arbitrator was given limited remedial authority under the contract. He could only "recommend" reinstatement, financial reimbursement, and other forms of relief to teachers.

14. The Master Contract uses the term "professional employee" throughout. For example, in Area I, Article 2 in the section entitled "Unit," the Board recognizes the LCEA as the "exclusive representative for the purpose of collective negotiations of all professional employees employed by the Board, eligible for such representation, excluding those designated by the Board as management personnel pursuant to TCA 49–5–608." It further explains that nothing in the Master Contract "shall prohibit any professional employee from appearing before the Board provided that his appearance is in conformity with the provisions of TCA 49–5–601 through 49–5–613."

§ 49–2–301(b)(1)(EE), (FF).[15] The EPNA affords no assistance. Thus, Taylor's coaching assignment was not protected by the terms of the collective bargaining agreement.

■■■■ In summary, we reiterate several important principles relating to the collective bargaining process: (1) the Board of Education is the supreme power in the school system; (2) the Board of Education assigns duties to the director; (3) the director acts for the Board of Education; (4) the director's authority over personnel decisions must be exercised consistent with the Board of Education's policies and collective bargaining agreements; (5) the delegation of authority to the director over personnel matters does not alter, diminish, or supersede the authority of the Board and teachers to negotiate effective agreements under the EPNA; (6) all acts of the director must be consistent with the Board's contracts; (7) the director's power to transfer tenured teachers under Tennessee Code Annotated section 49–5–510 must be exercised in a manner compliant with any existing collective bargaining agreement; (8) the collective bargaining agreement is limited in scope to personnel in their positions as professional employees; (9) transfers or assignments are permissive subjects of bargaining that the Board may—but is not required to—negotiate; (10) such subjects of bargaining govern personnel only as to their professional employee status; (11) professional employees who assume duties for which no license is required are governed in that supplemental capacity by year-to-year contracts; and (12) such year-to-year appointments are not

entitled to the benefits of the collective bargaining process. Thus, we are constrained to hold that our statutes preclude an education association, as the bargaining unit for the licensed professional employee, from representing teachers in their capacity as coaches.

Taylor's claim under the collective bargaining agreement squares with the arbitrator's interpretation that relieving a tenured teacher of coaching duties is equivalent to a transfer. He argues that because transfers must be in accordance with any locally negotiated agreement, the termination of his coaching responsibilities was a breach of contract. While his removal as basketball coach may have been a transfer, however, as indicated by the several cases cited in the preceding section, it was not governed by the transfer provisions of the negotiated agreement. The arbitrator's ruling that the Master Contract governed the renewal of Taylor's coaching contract was erroneous.

■■■ It is important to note that while public policy considerations generally favor the arbitration of collective bargaining disputes, an arbitrator's decision cannot act in contravention of statutes. Pursuant to Tennessee Code Annotated section 29–5–313, the Uniform Arbitration Act, a trial court may vacate a decision where the arbitrator exceeds their powers. "Arbitrators 'exceed their powers' when they go beyond the scope of authority …" granted by the arbitration agreement. *Arnold v. Morgan Keegan & Co., Inc.*, 914 S.W.2d 445, 450 (Tenn.1996) (quoting *Intn'l. Talent Group, Inc. v. Copyright Mgmt., Inc.*, 769 S.W.2d 217, 218 (Tenn.Ct.App.1988)). The director of schools has the power to name the coaches in our schools. An arbi-

---

**15.** (FF) All persons who are employed in a position for which no teaching license is required shall be hired on a year-to-year contract. The director shall provide a person who is employed in such a position fifteen (15) days' notice of nonrenewal of the contract before the end of the contract period.

trator interpreting a locally negotiated agreement may not intercede in that regard. To the extent that an arbitrator's award interferes with the authority of a director of schools to appoint coaches, the award is unenforceable. *See* Tenn.Code Ann. § 29–5–313(a)(3) (stating that an arbitrator's decision may be vacated where the arbitrator exceeds powers).

▮ In these unique circumstances, however, the judge upheld the arbitrator's decision not because of its correctness, but because the BOE had unanimously approved the recommendations at its meeting in June of 2002. In our view, the judge made an accurate assessment in that regard. Even though the terms of the Master Contract did not afford Taylor any entitlement to relief, the BOE, as the supreme authority within the local school system, gave vitality to his claim by adopting the arbitrator's interpretation. It had the statutory authority to do so. It is our conclusion, therefore, that to the extent of the terms approved by the BOE, Taylor has the right to sue under "contract."

## V. Remedies

Taylor has been granted relief for school year 2001–2002. That was not at issue in the chancery proceeding. In this appeal, the question is whether he is entitled to further remedies, either under the contract or by statute. As stated, the judge awarded the coaching supplement for 2002–2003 even though the arbitrator did not. Unlike 2001–2002, the BOE did not approve a supplement for that school year.

In support of their motion for summary judgment, Taylor and the LCEA first argued that the Director "failed to follow the Arbitrator's ruling" by "removing Taylor the second time on July 18, 2002." The arbitrator, however, merely speculated that the Director would "most likely" assign Taylor "to serve as basketball coach

again." He did not order the Director to do so. The BOE did not address the subject. Thus, the argument that the Director "failed to follow" the decision is flawed.

Taylor and the LCEA next argued a more substantial claim—that the Director not only transferred Taylor in violation of statutory law, Tennessee Code Annotated sections 49–2–301(b)(1)(EE) and (HH) and 49–5–510, but did so contrary to the terms of the Master Contract. In support of that contention, Taylor and the LCEA assert that the Director's decision to transfer Taylor for 2002–2003 was "based on the same information and material he relied upon in violation of the Master Contract in 2001[–2003]," that the Director founded his decision on "past complaints," and that the Director "ignored the Arbitrator's ruling by failing to consider Taylor as the incumbent coach."

The Director and the BOE filed a response to the motion for summary judgment challenging those assertions. Although the Director acknowledged by deposition that he had received complaints prior to the spring of 2001, including allegations that Taylor cursed in front of his players and otherwise acted in an inappropriate manner, he also contended that he had received complaints about Taylor every year that he coached at Loretto High School. In a prepared statement to the BOE, which was made a part of the record, the Director explained that his decision not to appoint Taylor as coach for the 2002–2003 season was in the "best interest of Loretto High School." He asserted that he had disregarded the 2001 complaints against Taylor, had treated him as the incumbent, and had considered "the totality of the circumstances ... all the good things and all the bad things." He also informed the BOE that Christy Green

carried "less controversy" as coach than did Taylor.

Whether the Director is to be believed requires a credibility assessment; however, a trial court is not to " 'weigh' " the evidence when evaluating a motion for summary judgment. *See Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn.1993) (citing *Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 389 (Tenn.1986)). Issues of witness credibility present issues of fact and must be construed in favor of a non-moving party when considering a motion for summary judgment. *See Byrd*, 847 S.W.2d at 210.

The factual disagreement presented by the Director is two-fold: (1) whether the Director considered the same issues that resulted in his dismissal in 2001–2002; and (2) whether the Director considered Taylor the incumbent in making the assignments for the following year. These are indeed genuine issues of material fact that must legitimately be resolved by the evidence. Taylor, therefore, is not entitled to any coaching supplement for 2002–2003 on motion for summary judgment. The correctness of the judge's ruling that the Director's decision to replace Taylor for the 2002–2003 school year was an "obvious failure to follow the letter and spirit of the arbitration decision [adopted by the BOE]" depends upon the propriety of the transfer. Whether the Director disregarded the 2001 complaints and treated Taylor as incumbent for 2002–2003 are genuine issues of material fact.

Even though portions of the Director's deposition testimony may be subject to challenge on a credibility basis, we must, in consideration of the grant of summary judgment, "take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *See Byrd v.*

*Hall*, 847 S.W.2d 208, 210–11 (Tenn.1993). The uncontested facts do not support a grant of summary judgment as to any remedies sought for 2002–2003.

### Conclusion

The Director had the statutory authority to transfer Taylor subject only to board policy or the collective bargaining agreement. By approving the arbitrator's recommendations at the conclusion of the grievance process, the BOE, as a matter of policy, entitled Taylor to supplemental pay in 2001–2002 and incumbency status for the following school year, but nothing more. By statute, a tenured teacher has only a year-to-year term in a coaching capacity. There are genuine issues of material fact as to the claim for any coaching supplement for 2002–2003; therefore, the grant of summary judgment is set aside, in part, as to that award. The judgment is otherwise affirmed. The cause is remanded for a determination of whether Taylor can establish that the transfer was arbitrary, capricious, or improperly motivated, in violation of either statute or the arbitration decision adopted by the BOE. Costs of the appeal are taxed one-half to the plaintiffs, Lawrence County Education Association and Jerry Taylor, and one-half to the defendants, Lawrence County Board of Education and Larry Morrow, for which execution may issue, if necessary.