# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 6, 2019 Session

## STEPHEN P. GELLER v. HENRY COUNTY BOARD OF EDUCATION

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Henry County**
**No. 22822     Carma Dennis McGee, Judge**

_____

### No. W2017-01678-SC-R11-CV

_____

In this appeal, we apply the Teacher Tenure Act to the transfer of a tenured teacher, working as a school administrator, for lack of proper credentialing. The plaintiff school administrator challenges the decision of the director of schools to transfer him to a teaching position because the plaintiff did not have an administrator license. The trial court upheld the transfer. The Court of Appeals reversed. It held that a regulation required the director to review the administrative duties the plaintiff had performed in the past in order to determine whether an administrator license was required, and that the director's failure to do so rendered his transfer decision arbitrary and capricious. Under Tennessee caselaw, judicial review of a school system director's decision to transfer a teacher must be conducted in light of the director's broad discretion to make such decisions. The proof showed that the director and the board of the school system had established certain priorities for its administrators. Absent an administrator license, in the upcoming school year, the regulation would have precluded the plaintiff from performing duties consistent with the school system's priorities. Consequently, the director's failure to consider the plaintiff's past work did not render the transfer decision either arbitrary or capricious. Under these circumstances, we hold that the plaintiff failed to meet his burden of proving that the transfer decision was not made in good faith and was arbitrary, capricious, or improperly motivated. We reverse the decision of the Court of Appeals and affirm the trial court's judgment in favor of the school board.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Chancery Court Affirmed**

HOLLY KIRBY, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Christopher C. Hayden and Katherine Cherry Wallace, Jackson, Tennessee, for the appellant, Henry County Board of Education.

Richard Colbert, Nashville, Tennessee, for the appellee, Stephen P. Geller.

Garrett Knisley and Ben Torres, Nashville, Tennessee, for Amicus Curiae Tennessee School Boards Association.

Charles W. Cagle and George S. Scoville, Nashville, Tennessee, for Amicus Curiae Tennessee Organization of School Superintendents.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff/Appellee Stephen P. Geller began working as an educator in the Henry County School System ("School System") in 1990. Between 1990 and 2006, Mr. Geller worked in a variety of capacities within the School System, including assisting with special needs students, working with at-risk high school students in their senior year in need of guidance, and teaching history, English, and economics. He held a valid teaching license and was granted tenure.

In 2006, the director of the School System, Rick Kriesky, appointed Mr. Geller to the position of assistant principal of Henry County High School ("HCHS"). HCHS had two assistant principals; both reported to the principal, who assigned daily job duties. Director Kriesky required Mr. Geller to obtain his master's degree within two years, which Mr. Geller did. Director Kriesky did not require Mr. Geller to obtain an administrator license. Mr. Geller never obtained such a license.

- 2 -

In approximately March 2010, Samuel Miles became the new director of the School System. At the time of his appointment, Director Miles did not inquire about the administrator license of Mr. Geller or any other assistant principal.

During 2011 and 2012, Mr. Geller attended a state-sponsored academy in Nashville for assistant principals. At the conclusion of the academy, the organizers asked each attendee to complete a form. The purpose of the form was to advance a Beginner Administrator License ("BAL") to a Professional Administrator License ("PAL").[1] Even though he did not have any type of administrator license to advance, Mr. Geller filled out the form and turned it in. The completed form was submitted to the Tennessee Department of Education.

In response to the mistaken request to advance Mr. Geller's administrator license, a research and license specialist with the Department of Education, Dr. Kenneth Nye, sent Mr. Geller a letter dated May 26, 2012, with a copy to Director Miles. The letter noted that Mr. Geller, though working as an assistant principal, did not have any type of administrator license to advance. It recited the requirements for an administrator license and outlined how Mr. Geller could obtain one:

> This letter is to inform you that our office has denied the application for advancement to the Professional Administrator License which was received in our office on March 7, 2012. The reason for the denial is you do not currently hold a Beginner Administrator License from which to advance to the Professional Administrator License. Your state license file does not indicate a previous application for the BAL license or that you attempted and passed the required Praxis SLLA[2] exam to obtain the BAL license.
>
> Please note that beginning with the 2009-10 school year, the State Board of Education has required educators serving as an assistant principal with more than 50% time of instructional leadership responsibilities to hold an administrator license. Educators serving as a principal or instructional

---

[1] In Tennessee, Instructional Leadership Licenses (Aspiring, Beginning, Professional, and Exemplary) have replaced Beginner Administrator Licenses and Professional Administrator Licenses. The differences between the instructional leadership licenses and the older beginning and professional administrator licenses are not relevant to the issues in this appeal.

[2] "SLLA" stands for "School Leaders Licensure Assessment," and Praxis is a comprehensive test associated with licensure for school administrators.

supervisor have always been required to hold an administrator license. Your employment record indicates servi[ce] as an assistant principal starting with the 2006-07 school year.

Your state license file indicates completion of a Master's degree at Bethel University in 2008. I suggest you contact the university so they can assist you in determining what else must be completed along with the Praxis SLLA exam to be eligible for the new administrator license called the Instructional Leadership License – Beginning (ILL-B). The standards for the BAL license went out of effect September 1, 2011 after the State Board of Education adopted new administrator licensing standards in 2008-09. You will not be able to apply for an initial BAL license as the standards for that administrator license have expired. However, you and the employing Tennessee school system can apply for the "Aspiring" level of the new administrator license (i.e. ILL-A) while serving as an assistant principal once you are admitted to the new Leadership Program.

Once you complete requirements to obtain the ILL-B license, you can complete the requirements for advancing to the professional level of that license (i.e. ILL-P) if you are serving in an administrator position. Bethel University can recommend you for the ILL-B license based upon completion of the new Leadership Program requirements which include passing the Praxis SLLA exam.

Thus, Dr. Nye's letter informed Mr. Geller that the State Board of Education "required educators serving as an assistant principal with more than 50% time of instructional leadership responsibilities to hold an administrator license" and suggested he contact the university from which he received his master's degree about obtaining an administrator license.

Director Miles received his copy of Dr. Nye's letter on approximately June 5, 2012. From reading the letter, Director Miles learned that Mr. Geller had no form of administrator license, not even a beginner license.

By the time Director Miles received his copy of Dr. Nye's letter, Mr. Geller had already received written notice of his assignment as an assistant principal at HCHS for the upcoming 2012-2013 school year. Director Miles called Mr. Geller to arrange a meeting to discuss the letter. Due to Mr. Geller's travel schedule, the two did not meet until June 28, 2012.

In the June 28 meeting, Director Miles referred to Dr. Nye's letter and told Mr. Geller that he had to have an administrator license to serve as an assistant principal. Director Miles asked Mr. Geller whether he could get an administrator license before the start of the new school year, and Mr. Geller indicated that was not possible.[3] By the end of the meeting, it was apparent that Mr. Geller was not going to be returning to HCHS as an assistant principal. Mr. Geller told Director Miles he could retire at the end of the 2012-2013 school year but needed to keep his health insurance until then. Director Miles offered to find Mr. Geller a one-year position within the School System.

Director Miles transferred Mr. Geller to a position as a teacher at the Alternative School, a non-administrative position within the School System. In addition, Director Miles arranged for Mr. Geller to receive a salary supplement to assist the Alternative School's principal with administrative duties. Mr. Geller received official notice of the transfer in August 2012.

The school district sent Mr. Geller a contract setting out the terms of the reassignment. When Director Miles received the executed contract in mid-September, he saw Mr. Geller had written a note at the bottom of the document: "I believe I was wrongfully removed as Assistant Principal at Henry County High School and am signing this contract only as a matter of financial necessity." After he saw the notation, Director Miles met with Mr. Geller about his concerns. Mr. Geller objected to the decrease in pay associated with the transfer, so Director Miles offered to let him serve as a Common Core auditor for supplemental pay. Mr. Geller declined.

Mr. Geller served in the new position for a year. He then retired.

Eventually, Mr. Geller filed a lawsuit against the Henry County Board of Education ("Board") in the Chancery Court for Henry County.[4] The suit alleged

---

[3] There is some dispute about the details of the conversation at the June 28 meeting.

[4] Before he filed suit against the Board, Mr. Geller appealed his reassignment to the school district complaint manager, alleging age discrimination. The district manager determined that allegations were unsubstantiated, and Mr. Geller appealed to the Board. The Board affirmed the reassignment. Mr. Geller subsequently filed a federal lawsuit, alleging age discrimination. It was dismissed. *Geller v. Henry Cnty. Bd. of Educ.*, No. 13-1196, 2014 WL 4444048, at *7 (W.D. Tenn. Sept. 9, 2014), *aff'd*, 613 F. App'x 494 (6th Cir. 2015).

unlawful transfer under a provision of the Tennessee Tenure Teacher Act, Tennessee Code Annotated section 49-5-510.[5]

After discovery, the chancellor conducted a bench trial in which she heard testimony from Mr. Geller, Director Miles, and other witnesses. Much of the testimony either described Mr. Geller's duties as assistant principal or discussed instructional leadership.

Mr. Geller testified at the outset of the trial. He outlined his history with the School System, and he detailed his job duties after he became assistant principal at HCHS in 2006. Until the 2010-2011 school year, Mr. Geller was the chief disciplinarian of the two assistant principals at HCHS. As such, he spent 70-80% of his time implementing discipline.[6]

Mr. Geller's job duties changed in the 2010-2011 school year. The other assistant principal at HCHS took over most of the disciplinary duties from Mr. Geller and also monitored students and performed teacher evaluations. In turn, Mr. Geller assumed lunchroom monitor duties for two hours each day. He frequently walked the halls of HCHS to ensure students were where they were supposed to be. Mr. Geller also oversaw grounds maintenance, interacted with vendors, made bank deposits, ran fire and safety drills, and conducted observations for teacher evaluations. The responsibility for evaluating teachers was shared among all the school administrators, so Mr. Geller spent a relatively small amount of time on it. For one month each summer, Mr. Geller kept the school building open for sporting events and a free meal program.

Additionally, during the 2010-2011 school year, Mr. Geller led an advisor/advisee program aimed at increasing student performance. Mr. Geller developed the curriculum for the program. Mr. Geller also oversaw all meetings of the school's professional

---

[5] Tennessee Code Annotated section 49-5-510 provides:

> The director of schools, when necessary to the efficient operation of the school system, may transfer a teacher from one location to another within the school system, or from one type of work to another for which the teacher is qualified and licensed; provided, that transfers shall be acted upon in accordance with board policy.

Tenn. Code Ann. § 49-5-510 (2016).

[6] At one point, Mr. Geller "requested that the other administrators do paddling" for him because he developed a tear in his rotator cuff that made "paddling" difficult. Once that was healed, he said, "I went back to paddling."

learning communities, which were collaborative teams of teachers that met to discuss instructional improvement.

After outlining his job history with the School System, Mr. Geller noted that the principal of HCHS gave him an excellent evaluation as assistant principal for the 2011-2012 school year, the highest rating. Director Miles' transfer of Mr. Geller took place after Mr. Geller had received the principal's evaluation.

Mr. Geller explained that, at the conclusion of the state-sponsored academy for assistant principals, he filled out the form for advancement of an administrator license because an academy organizer handed the form to all of the participants and directed them to fill it out. Mr. Geller did not have an administrator license to advance, but he filled out the form without paying much attention to it and handed it in.

Mr. Geller received the response letter from Dr. Nye after he returned home from an out-of-town trip. At the same time, he got a telephone message from Director Miles that he wanted them to meet about the Nye letter. They met on June 28.

At the June 28 meeting, Mr. Geller testified, Director Miles asked him what he was going to do about the Nye letter and indicated that he had to have an administrator license to continue as an assistant principal. Mr. Geller responded that, when Director Kriesky hired him, all he needed was a master's degree to serve as assistant principal; no administrator license was required. He outlined for Director Miles how he spent his time at HCHS, to demonstrate that he had spent less than 50% of his time engaged in instructional leadership, as referenced in the State Board of Education standards. According to Mr. Geller, Director Miles responded that "things had changed" and commented that he would be a liability without an administrator license.[7]

Mr. Geller testified that Director Miles asked him whether he could get an administrator license before the start of the new school year. Mr. Geller indicated that was not possible; he would have to complete fifteen-to-eighteen credit hours and pass the Praxis exam by August. Mr. Geller said that, in their conversation, Director Miles did not mention his working to obtain an administrator license while continuing as an assistant principal at HCHS. Had Director Miles offered him the opportunity to get his

---

[7] Mr. Geller said he asked Director Miles to contact Dr. Nye to clarify the requirements in the letter and also to contact the HCHS principal to confirm Mr. Geller's duties, but Director Miles did not contact either of them.

administrator license during the 2012-2013 school year while continuing as assistant principal, Mr. Geller said, he would have done so.[8]

By the end of the meeting, Mr. Geller surmised Director Miles was not going to permit him to return to HCHS as an assistant principal. Consequently, he told Director Miles he could retire at the end of the 2012-2013 school year but emphasized that he needed to keep his health insurance until then. Director Miles offered to find Mr. Geller a one-year position within the School System. Mr. Geller later learned that he would be transferred to a teaching position at the Alternative School.[9]

In his testimony, Mr. Geller maintained that, as assistant principal at HCHS, he spent most of his time performing functions that did not constitute instructional leadership. Disciplining students, his main duty prior to the 2010-2011 school year, was something Mr. Geller did not consider to be instructional leadership. Mr. Geller acknowledged he spent less time disciplining students during the 2010-2011 school year, but he maintained he still engaged in instructional leadership less than 50% of the time. He said he would not have retired at the end of the 2012-2013 school year had he been permitted to remain an assistant principal at HCHS.

Lennie McFerren served as principal of HCHS while Mr. Geller was assistant principal, from 2007 until the transfer. Mr. McFerren testified that Mr. Geller's duties included student discipline; monitoring the lunchroom, hallways, restrooms, and grounds; and occasionally monitoring teachers. He defined instructional leadership as "a group of people [with] the same goal in education." According to Mr. McFerren, Mr. Geller spent most of his time supervising students; he said Mr. Geller never spent more than 50% of his time on instructional leadership.

Betsy Allison served as assistant principal at HCHS for several years with Mr. Geller, from fall 2007 through spring 2010. She held an administrator license. Ms.

---

[8] Mr. Geller acknowledged that the letter from Dr. Nye outlined how he could obtain an "aspiring" administrator license while continuing to serve as an administrator. He said he did not apply for an aspiring administrator license because he was focused on the fact that he had not spent over 50% of his time on instructional leadership and consequently was convinced that he did not need any type of administrator license. He also assumed that Director Miles had to affirmatively offer that option to him, which he insisted Director Miles did not do.

[9] Mr. Geller's teaching position at the Alternative School had a base salary of $49,342. In addition, Mr. Geller was to receive $1,000 to assist the school's principal with administrative duties, for a total compensation of $50,342. This amount was about $10,000 less than Mr. Geller would have made as assistant principal.

Allison's duties included teacher evaluations, helping with curriculum and instruction, classroom organization, bus duty, and bathroom duty. Ms. Allison broadly defined instructional leadership as "anything and everything that goes on in and around the school." In her view, school administrators are to do whatever is needed to enable teachers to use their classroom time for instruction. In this respect, she considered almost all duties performed by assistant principals to fall within the realm of instructional leadership.

The trial court also heard testimony from the HCHS assistant principal who took Ms. Allison's place, Timothy Mason. Mr. Mason attended the academy for assistant principals with Mr. Geller for the purpose of advancing his administrator license from the beginner level. Mr. Mason considered many of his duties as assistant principal to be managerial in nature, "things like school climate, safety, discipline, making sure teachers have the supplies they need, making sure kids get to class on time." Examples of instructional leadership, he said, were things like "[b]eing in the classroom evaluating teachers" and "making sure good instruction [was] happening." Mr. Mason agreed that monitoring building conditions, monitoring the school cafeteria, and student discipline were managerial functions that did not involve instructional leadership. According to Mr. Mason, during the time Mr. Geller served at HCHS with him, Mr. Geller had the more academic role of the two assistant principals.

Director Miles testified as well. He said that, when he began his tenure as Director of the School System, he did not check the credentials of school administrators such as Mr. Geller. He had no reason then to doubt that Mr. Geller or the other assistant principals had the appropriate licensure. When Mr. Geller and the other assistant principal at HCHS, Mr. Mason, attended the academy for assistant principals, Director Miles received a travel request for their attendance. At that time, Betsy Allison told Director Miles that both Mr. Mason and Mr. Geller were attending the academy in order to advance from a beginner administrator license to a professional administrator license.[10]

When Director Miles received his copy of Dr. Nye's letter to Mr. Geller, he learned Mr. Geller in fact had no administrator license to advance. He did not clearly remember the details of the ensuing June 28 meeting with Mr. Geller about the letter. He remembered asking Mr. Geller about obtaining an administrator license, telling him he could start the program to get an administrator license, and giving Mr. Geller the opportunity to say that he was working toward an administrator license, as outlined in Dr.

---

[10] Mr. Mason had a beginner administrator license, but Mr. Geller did not.

Nye's letter. Instead, Mr. Geller refused to obtain the license and had no plan for doing so.

After the June 28 meeting, Director Miles decided he had to transfer Mr. Geller from the assistant principal position. The principal's evaluation of Mr. Geller's performance as assistant principal had no bearing on Director Miles' decision because the question was one of licensure. Director Miles did not check with the principal of HCHS to see if Mr. Geller had spent more than 50% of his time on instructional leadership. He said his decision was based on Dr. Nye's letter to Mr. Geller as well as Director Miles' experience as an educator. Director Miles believed that, to hold an administrator position in the School System, administrator or supervisory certification was required, and he never considered whether he had the power to waive that requirement. In 24 years as an educator, Director Miles testified, he'd never worked with anyone in an administrator position who did not have an administrator license.

Director Miles described instructional leadership as "having the capacity to deal within the school—a focus, a keen focus, on teaching and learning" with an "end result of . . . great classroom instruction that leads to every student growing every year, every day, every week of the school year." He understood that, at times, other things had to be done, but "the main focus of administration should be on instruction, teaching and learning in the school."

Director Miles testified that having instructional leaders in administrator positions was "the single most important thing other than classroom instruction that takes place in a school." He said student improvement required trained and credentialed leaders and administrators who were "well-versed in what good classroom teaching looked like and how to organize and develop a . . . school improvement plan[] that would lead to student improvement." He described instructional leadership as "a huge key to success of schools."

When he became the School System's Director in 2010, Director Miles testified, he "received a letter from the State saying our high school was in . . . the bottom 10 percent in achievement of all nontitle schools." Improving that situation, he felt, depended on training and having administrators involved in instructional leadership. To that end, Director Miles trained the district's administrative leaders to implement professional learning communities focused on improving classroom instruction and curriculum and created instructional leadership teams to analyze data related to student progress and use the data to improve instruction within the schools.

Based on his experience, Director Miles felt that the training associated with getting the required administrator license was as important as the license itself. He understood it was a Board priority that administrative certification was required to serve as an administrator in the School System. This was "the direction our district was moving in." Director Miles said, "it was our intent in the best interest of Henry County that we have administrators that were properly licensed." Had he left Mr. Geller in place as assistant principal at HCHS, "[h]e would have been the only administrator. . . not to hold professional licensure in the entire county. . . and I felt that was not in the best interest of Henry County." For those reasons, Director Miles said, he transferred Mr. Geller from the position of assistant principal at HCHS.

The trial court took the case under advisement and later entered detailed findings of fact and conclusions of law. The factual findings on what happened largely aligned with Mr. Geller's recounting of the events. However, the trial court credited Director Miles' testimony about the need for assistant principals to hold an administrator license and his motivation in transferring Mr. Geller. It found:

29.    Miles had the responsibility of ensuring that all licensed employees of the school system had the appropriate license for their positions. He never questioned whether Plaintiff was qualified to be an assistant principal until he received the letter from Nye in June, 2012.

30.    Miles had assumed that Plaintiff had been working toward an administrator's license when he signed the application for license upgrade after Plaintiff had been to the Assistant Principal's Academy. Miles believed that every administrator had to have a license and had never worked with one who did not. Miles never considered that he had the power to waive the licensing requirements.

31.    Miles did not investigate whether Plaintiff spent more than 50% of his time in instructional leadership but believed that it was not in the best interest of the school for Plaintiff to remain in that position because he was the only administrator in the county without an administrator's license.

32.    Miles would have allowed Plaintiff to remain as Assistant Principal until he received the Nye letter. That letter was the first notice Miles had that Plaintiff did not have some type of administrator's license. Miles further testified that he would have kept Plaintiff in the same position had

Plaintiff stated that he would start obtaining his administrator's licensure. The Court finds his testimony credible.

33.     Miles did not consider Plaintiff's evaluation scores because he believed those to be irrelevant if Plaintiff did not hold the correct licensure for his position.   Miles maintains that his sole reason for transferring Plaintiff was because he had no administrator's license and, therefore, Miles believed he had no choice.  The Court finds his testimony credible.

The trial court concluded Director Miles "believed that the transfer of Plaintiff from his position as HCHS Assistant Principal was necessary to the efficient operation of the school system.  Although Plaintiff was a highly qualified teacher in at least two subjects, he did not possess any type of administrator's license."  It found that "Director Miles believed that Plaintiff was required to hold an administrator's license, and that Plaintiff's failure to do so prohibited him from continuing as Assistant Principal" and held that "Plaintiff's failure to hold an administrator's license was the sole reason for his transfer."

The trial court rejected Mr. Geller's argument that he should not have been transferred because, as an assistant principal, he had spent less than 50% of his time on instructional leadership:

Plaintiff relies on the "50% rule" as a justification for never obtaining an administrator's license.  Said rule requires that any administrator who spends more than 50% of his or her time in instructional leadership hold an administrator's license.  The term "instructional leadership" is not specifically defined in any statute or regulation.  Several veteran educators testified before this Court and each held their own beliefs as to the meaning of the term.  Therefore, it was reasonable for Miles to believe that the term was defined differently than Plaintiff and to believe that a review of Plaintiff's specific daily activities was not necessary to determine whether the "50% rule" affected his licensure requirement. Several educators who testified believed that everything within the duties of an assistant principal encompassed "instructional leadership."  Without specific statutory or regulatory definition, their belief is reasonable. Further, the fact that Plaintiff's performance evaluations were excellent did not cure the fact that he was not licensed as an administrator.

The trial court found "that [Director] Miles acted based upon a good faith belief that Plaintiff's transfer was necessary to the efficient operation of the school system."  It

concluded Mr. Geller was not entitled to relief because Director Miles did not act arbitrarily, capriciously, or with improper motive when transferring him. The trial court dismissed Mr. Geller's complaint and entered a final judgment in favor of the Board. Mr. Geller appealed the trial court's decision to the Court of Appeals.

The Court of Appeals reversed the trial court. *Geller v. Henry Cnty. Bd. of Educ.*, No. W2017-01678-COA-R3-CV, 2018 WL 4944542 (Tenn. Ct. App. Oct. 12, 2018), *perm. app. granted*, (Tenn. Mar. 28, 2019). It focused on the above-referenced "50% Rule," Tennessee Board of Education Rule and Regulation 0520-02-03-.02(6) (2009), which requires assistant principals with more than 50% of their responsibilities involved in instructional leadership to hold an administrator license.[11] *Id. at \*6.* Mr. Geller argued that, because Director Miles did not determine that Mr. Geller had spent more than 50% of his time on instructional leadership while serving as assistant principal at HCHS, the decision to transfer him for lack of an administrator license was not made in good faith and was not necessary for the efficient operation of the school system. *Id*. at \*5.

The Court of Appeals framed the primary issue as "whether the law required Mr. Geller to hold an administrator's license." *Id*. at \*6. It acknowledged that, under Tennessee law, there is a rebuttable presumption that a director's decision to transfer a tenured teacher was made in good faith; the party challenging the director's decision has the burden to prove the decision was arbitrary, capricious, or improperly motivated. *Id*. at \*4 (citations omitted). The Court of Appeals held that Mr. Geller had rebutted the presumption of good faith and had met the required burden of proof. *Id*. at \*8.

The intermediate appellate court observed that Director Miles testified at trial that he believed all administrators were required to hold licenses. It characterized that belief as not "reasonable or determinative," and noted that only assistant principals who spend the majority of their time in instructional leadership need be licensed. *Id*. at \*7 (citing Tenn. Comp. R. & Regs. 0520-02-03-.03(5)). It found Director Miles transferred Mr. Geller solely because he did not have an administrator license, without considering his performance evaluations or how much of his time had been spent on instructional leadership. *Id*. at \*8.

---

[11] The citation to this regulation has changed over time, as explained in footnote 18 *infra*. We note that when referencing the "50% Rule," the Court of Appeals cited Tenn. Comp. R. & Regs. 0520-02-03-.03(5) (2015). At the time of Mr. Geller's transfer, the 50% Rule was set forth in Tenn. Comp. R. & Regs. 0520-02-03-.02(6) (2009), so we generally use this citation of the regulation in this Opinion.

The Court of Appeals concluded that "a review of Mr. Geller's specific tasks was required to determine the necessity of an administrator's license in his position as [a]ssistant [p]rincipal." *Id*. It held:

> In the absence of any attempt to determine whether Mr. Geller was actually spending the majority of his time in instructional leadership, Director Miles lacked 'sufficient, demonstrable grounds' for transferring Mr. Geller on the basis of his lack of license. Likewise, because Director Miles had insufficient grounds to conclude that Mr. Geller lacked a required license, Director Miles' decision to transfer Mr. Geller without consideration of the timing of transfers or Mr. Geller's stellar evaluations was in violation of Board policy. Given the lack of investigation into whether Mr. Geller was required to obtain a license under Rule and Regulation 0520-02-03-.03(5), Director Miles had no substantial and material evidence upon which to conclude that the transfer was 'necessary to the efficient operation of the school system.' Under these circumstances, we must conclude that the presumption of good faith has been rebutted and the transfer at issue violated section 49-5-510.

*Id*. (emphasis removed) (internal citations omitted).

The Board sought permission to appeal to this Court, contending that the Court of Appeals erred in concluding that Director Miles' transfer of Mr. Geller did not comply with Tennessee Code Annotated section 49-5-510. We granted permission to appeal.

## ANALYSIS

The Tennessee Constitution gives the General Assembly plenary authority over public schools. Tenn. Const. art. II, §3, art. XI, § 12; *Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ.*, 244 S.W.3d 302, 310 (Tenn. 2007). *See also Thompson v. Memphis City Sch. Bd. of Educ.*, 395 S.W.3d 616, 622 (Tenn. 2012). Pursuant to this authority, in 1951, the legislature enacted the Teacher Tenure Act ("Tenure Act"), Tennessee Code Annotated sections 49-5-501, *et seq*. *Thompson*, 395 S.W.3d at 623 (citation omitted).

The Tenure Act defines the term "teacher" broadly to include not only teachers but also "supervisors, principals," and others employed in public schools. Tenn. Code Ann. §

49-5-501(11) (2016).[12]  It gives tenure rights to principals and assistant principals in their capacity as teachers, not school administrators.  Tenn. Code Ann. § 49-5-501(11)(A); *White v. Banks*, 614 S.W.2d 331, 334 (Tenn. 1981).

Mr. Geller was at all relevant times tenured.  The Tenure Act's definition of "tenure" cautions: "No teacher, including administrative and supervisory personnel, who has acquired tenure status is entitled to any specific position."  Tenn. Code Ann. § 49-5-501(11).

Teacher transfers are within the scope of the Tenure Act.  Tenn. Code Ann. § 49-5-510 (2016); *McKenna v. Sumner Cnty. Bd. of Educ.*, 574 S.W.2d 527, 530 (Tenn. 1978).  "Transfer" is defined as "removal from one (1) position to another position under jurisdiction of the same board."[13]  Tenn. Code Ann. § 49-5-501(12).  The Tenure Act sets out the parameters for transfers:

> The director of schools, when necessary to the efficient operation of the school system, may transfer a teacher from one location to another within the school system, or from one type of work to another for which the teacher is qualified and licensed; provided, that transfers shall be acted upon in accordance with board policy.

Tenn. Code Ann. § 49-5-510.

This Court has recounted the history of the managerial authority of county boards of education and directors (also referred to as superintendents)[14] of schools over teacher transfers:

> As a part of the state's system of education and local administration, county boards of education, as elected by the people, have the duty and power to manage and control the public schools within their jurisdictions. .

---

[12] Unless otherwise indicated, we cite to the current version of the pertinent statutes.

[13] The reassignment of a principal or assistant principal to a teaching position is a transfer, not a termination or demotion that would trigger formal notice and hearing requirements.  *See Pullum v. Smallridge*, 652 S.W.2d 338, 340-41 (Tenn. 1983); *Marion Cnty. Bd. of Educ. v. Marion Cnty. Educ. Ass'n*, 86 S.W.3d 202, 207 (Tenn. Ct. App. 2001).

[14] In the record, the terms "director" and "superintendent" are used interchangeably.  For clarity, we will normally use "director."

- 15 -

. . Prior to 1992, a popularly elected superintendent of schools and the local board shared the authority for the placement of personnel. More specifically, Tennessee Code Annotated section 49-5-510 (1990), a part of the Teacher Tenure Act, required the approval of the board for the superintendent to transfer a teacher within the system from one school to another or from one job to another.

In 1992, the Educational Improvement Act ("EIA") implemented a corporate model of governance and replaced the elected superintendent position with a director of schools, appointed by and answerable to the board . . . . The director is empowered under the EIA "to employ, transfer, suspend, non-renew and dismiss all personnel" within the school system, subject only to limited restrictions. Further, as a part of the tenure section, the director is authorized, "when necessary to the efficient operation of the school system, [to] transfer a teacher from one location to another . . . or from one type of work to another for which the teacher is qualified and licensed." Tenn. Code Ann. § 49-5-510 (2002).

*Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 310-11 (alteration in original) (internal citations omitted). Thus, local school boards no longer have to approve teacher transfers.

Under section 49-5-510, "a director of schools has the statutory power to transfer teachers within the local system." *Id*. at 314 (citing Tenn. Code Ann. § 49-5-510 (2002)). "Our courts have interpreted [section 49-5-510] as giving superintendents . . . wide discretion" in making transfer decisions. *Marion Cnty. Bd. of Educ. v. Marion Cnty. Educ. Ass'n*, 86 S.W.3d 202, 208 (Tenn. Ct. App. 2001) (citing *Pullum v. Smallridge*, 652 S.W.2d 338, 341 (Tenn. 1983); *McKenna*, 574 S.W.2d at 534; *Mitchell v. Garrett*, 510 S.W.2d 894, 898 (Tenn. 1974)).

This Court has stated the limitations on judicial review of a director's transfer decision:

If a transfer is not made in good faith and is the product of arbitrary, capricious, or improper conduct, a tenured teacher is entitled to present a direct legal challenge in the courts. Judicial review is limited to determining "whether or not a transfer was made in accordance with the statutory requirements . . . and must be conducted in light of the broad discretion which the statutes clearly give."

*Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 314 (quoting *McKenna*, 574 S.W.2d at 534; citing *Mitchell*, 510 S.W.2d at 898). "A director's decision to transfer a teacher is afforded a presumption of good faith, and the party challenging the decision carries the burden to establish, by a preponderance of the evidence, that the decision was arbitrary, capricious or 'improperly motivated.'" *Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 814 (Tenn. Ct. App. 2010) (quoting *Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 315).[15] "The determinative question is whether the transfer could be classified as for the 'efficient operation of the school system.'" *Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 315.

In light of this standard, we examine the evidence in the record on Mr. Geller's transfer. As background for our review of the testimony, we note that the rules and regulations of the Tennessee State Board of Education included the so-called "50% Rule," effective in 2009, which stated assistant principals "with more than fifty percent (50%) of their responsibilities involved in instructional leadership" must have an administrator license or be enrolled in a program to obtain one. Tenn. Comp. R. & Regs. 0520-02-03-.02(6) (2009).[16]

The trial court credited Director Miles' testimony that his sole reason for transferring Mr. Geller was because he did not hold an administrator license. We review the testimony in light of that credibility determination. "[T]rial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Director Miles came to the job of Director of the Henry County School System with over 20 years' experience as an educator. In that time, he said, he had never worked with an administrator who did not have an administrator license.

Much of Director Miles' testimony emphasized the importance of instructional leadership to the success of students. In the context of administrators, he described

---

[15] *Compare Mitchell v. Garrett*, 510 S.W.2d at 898 ("[W]e must presume that the actions of a board or superintendent are not arbitrary or capricious, but are reasonable and fair unless there is clear evidence to the contrary.") (citing *Blair v. Mayo*, 450 S.W.2d 582 (Tenn. 1970)). The proper burden of proof for the party challenging the transfer decision is the preponderance of the evidence.

[16] The regulation stated that such assistant principals "must be properly licensed." Tenn. Comp. R. & Regs. 0520-02-03-.02(6). It is undisputed in this case that the "proper" licensure at issue is the administrator license. *See* footnote 18 *infra* regarding changes to the citation of this rule.

instructional leadership generally as maintaining "a keen focus on teaching and learning" to achieve "great classroom instruction that leads to every student growing every year, every day, every week of the school year." Director Miles acknowledged at times other things have to be done, but he underscored "the main focus of administration should be on instruction, teaching and learning in the school." Apart from classroom instruction, Director Miles testified, having instructional leaders in administrative positions was "the single most important thing." He characterized instructional leadership as "a huge key to success of schools."

Not long after he became the Director of the Henry County School System, Director Miles recounted, he received a letter from the State informing him that HCHS—the school at which Mr. Geller served as assistant principal—was in "the bottom 10 percent in achievement of all nontitle schools." Director Miles felt that remedying this abysmal assessment depended on having administrators trained and heavily involved in instructional leadership. Director Miles himself trained the School System's administrators to utilize instructional leadership techniques such as professional learning communities to improve classroom instruction, as well as instructional leadership teams to analyze data related to student progress.[17]

Apart from the credentialing associated with having an administrator license, Director Miles said his experience taught him that the training for the administrator license was as important as the license itself. He asserted that the Board's priority was to require administrative certification to serve as an administrator in the School System, that this was "the direction our district was moving in." His assertion is corroborated by the fact that every administrator in the School System held an administrator license, except for Mr. Geller.

Director Miles' testimony shows it was important to the Board and to Director Miles to prioritize instructional leadership by every administrator. This goes to whether the decision to transfer Mr. Geller from the assistant principal position for lack of an administrator license was "necessary to the efficient operation of the school system."

---

[17] Perhaps not coincidentally, during this same time period, Mr. Geller's job responsibilities at HCHS changed to include some of the measures Director Miles described. After several years as HCHS assistant principal with nearly 80% of his time spent on student discipline, during the 2010-2011 school year, Mr. Geller began spending significant time on job responsibilities such as leading an advisor/advisee program aimed at increasing student performance and overseeing meetings of the school's professional learning communities, collaborative teams of teachers that met to discuss instructional improvement.

Tenn. Code Ann. § 49-5-510.  The employment of properly credentialed professionals is paramount to the efficient operation of school systems.

Mr. Geller argues the transfer cannot be seen as "necessary" if the "50% Rule" did not require him to hold an administrator license.  He additionally points out that section 49-5-510 requires the transfer to be "in accordance with board policy."  Tenn. Code Ann. § 49-5-510.  Board policy, he asserts, is embodied in the "50% Rule," and the rule requires only assistant principals who spend more than 50% of their time on instructional leadership to hold an administrator license.  Mr. Geller testified he did not spend more than 50% of his time on instructional leadership.  He asserts Director Miles mistakenly believed that all assistant principals had to hold an administrator license, so his decision to transfer Mr. Geller was made "in total disregard of the 50% Rule."  We disagree.

The 50% Rule provided:

> Effective September 15, 2009, assistant principals. . . with more than fifty percent (50%) of their responsibilities involved in instructional leadership must be properly licensed or enrolled in a State Board approved instructional leadership preparation program.

Tenn. Comp. R. & Regs. 0520-02-03-.02(6).[18]  The "proper" licensure in this case is the administrator license.  *Id.*

Nothing in the 50% Rule prevented Director Miles and the Board from making instructional leadership central to the duties of the School System's administrators.  Director Miles' testimony establishes they had done just that.  Indeed, Director Miles indicated that the disquieting news that HCHS was in the lowest 10th percentile made it all the more crucial for their school administrators to spend the majority of their time on instructional leadership.

---

[18] At the time of Mr. Geller's transfer, this regulation was cited at Tenn. Comp. R. & Regs. 0520-02-03-.02(6).  This is the citation used in the trial record.  After subsequent amendments, the 50% Rule was moved to Tennessee Comprehensive Rules and Regulations 0520-02-03-.03(5).  That is the citation used in the Court of Appeals' opinion.  The current version of the 50% Rule is now found at Tenn. Comp. R. & Regs. 0520-02-03.10(2) (2020).  It states that dual assignment personnel whose work responsibilities include more than 50% instructional leadership must hold appropriate instructional leadership licensure.  Tenn. Comp. R. & Regs. 0520-02-03.10(1) currently requires all principals, assistant principals, and supervisors serving as instructional leaders to hold the appropriate instructional leadership license.

Once Director Miles and the Board decided to place this kind of priority on instructional leadership, the 50% Rule itself mandated that the School System's administrators hold an administrator license, or at least be in a program to obtain one. The 50% Rule imposed the requirement that assistant principals whose responsibilities are primarily comprised of instructional leadership "must be properly licensed." Thus, under the rule, an assistant principal without an administrator license *could not* be assigned responsibilities consisting mainly of instructional leadership.[19] Such a constraint on the responsibilities that could be assigned to Mr. Geller, because he did not have an administrator license, would have undermined the very priorities the Board and Director Miles had established.

According to Mr. Geller, because the 50% Rule does not require *all* assistant principals to get an administrator license, the decision by Director Miles and the Board to nevertheless impose such a requirement was not "in accordance with" Board policy as set forth in the 50% Rule. Respectfully, this argument turns the natural interpretation of the 50% Rule on its head. The 50% Rule, effective in 2009, supports school districts that prioritize instructional leadership by ensuring that administrators who implement instructional leadership in the schools are trained and credentialed to do so. Under the 50% Rule, if a director and a board decide to require school administrators to undertake responsibilities mainly comprised of instructional leadership, those administrators *must* have an administrator license. The 50% Rule is not meant to impede school districts from emphasizing instructional leadership, it is meant to support such a priority.

Mr. Geller argues, and the Court of Appeals held, that "a review of Mr. Geller's specific tasks was required to determine the necessity of an administrator's license in his position as [a]ssistant [p]rincipal." *Geller*, 2018 WL 4944542, at *8. Absent such a review, Mr. Geller argues, Director Miles' decision to transfer Mr. Geller must be deemed arbitrary and capricious. *Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 314.

We must respectfully disagree. A decision to transfer a teacher is necessarily prospective. In this case, the decision to transfer Mr. Geller reflected the responsibilities Director Miles and the Board wanted the HCHS assistant principal to have in the *upcoming* school year. Director Miles' testimony showed he and the Board wanted all of

---

[19] The term "instructional leadership" is not defined in either the Tenure Act or in the Board regulations, but in this opinion we need not determine the exact definition of that term. Whatever its precise meaning, the 50% Rule precluded an assistant principal without an administrator license from having responsibilities consisting of more than 50% instructional leadership.

the district's administrators, including the assistant principal at HCHS, to undertake responsibilities comprised of more than 50% instructional leadership. Whatever Mr. Geller's responsibilities had been in the past, the fact that he lacked an administrator license left him unable to execute on this judgment in the upcoming school year. Under the 50% Rule, in order for HCHS to have assistant principals whose responsibilities emphasized instructional leadership, Director Miles had no choice but to transfer Mr. Geller.

The necessary implication of Mr. Geller's argument is that, if an assistant principal's past responsibilities did not involve more than 50% instructional leadership, his school system cannot require him to have an administrator license and cannot transfer him for lack of an administrator license. Think for a moment how that would work under the facts of this case. Assuming *arguendo* that Mr. Geller's 2011-2012 responsibilities involved less than 50% instructional leadership, so the argument goes, the 50% Rule forbade Director Miles from requiring him to have an administrator license and compelled Director Miles to retain Mr. Geller as assistant principal at HCHS for the 2012-2013 school year. In turn, had Mr. Geller been retained as assistant principal in 2012-2013, under the 50% Rule, absent an administrator license, Mr. Geller was precluded from undertaking responsibilities involving more than 50% instructional leadership. Thus, at the end of the 2012-2013 school year, Director Miles would have been in the same place—he again would have been unable to require Mr. Geller to have an administrator license and unable to transfer him from the assistant principal position at HCHS for the upcoming 2013-2014 school year. Consequently, year after year, the School System would be locked in, forced to retain an assistant principal at HCHS with no administrator license who could not be assigned responsibilities involving more than 50% instructional leadership.

Mr. Geller's interpretation would consign a struggling school to indefinitely retaining an assistant principal who is precluded under the 50% Rule from performing mainly instructional leadership, simply because he had not done so in the past. We will not interpret the rule in a way that prevents a school system's leadership from improving its schools by adjusting the priorities for its administrators.

Thus, under the facts of this case, we conclude Director Miles was not obliged to base his transfer decision on Mr. Geller's past responsibilities or even to examine them. We must respectfully reject the Court of Appeals' conclusion that, "[w]ithout any investigation or understanding of Mr. Geller's daily tasks, . . . Director Miles' decision to transfer Mr. Geller solely on the basis of his lack of license was arbitrary and capricious." *Geller*, 2018 WL 4944542, at *8.

Mr. Geller also argues Director Miles' decision to transfer Mr. Geller was contrary to Tennessee Code Annotated section 49-5-510 because he did not consider Mr. Geller's excellent evaluation as assistant principal at HCHS.[20] He contends Tennessee Board of Education policy 5.201 and Tennessee Code Annotated section 49-1-302(d)(2)(A) require teacher and principal evaluations to be a factor in all employment decisions, including transfer decisions, with no exceptions. Because Director Miles failed to consider Mr. Geller's evaluation, Mr. Geller contends, the transfer decision was not made "in accordance with board policy." Tenn. Code Ann. § 49-5-510.

Section 49-1-302(d)(2)(A) provides that teacher and principal evaluations "shall be a factor in employment decisions, including, but not necessarily limited to, promotion, retention, termination, compensation and attainment of tenure status." Tenn. Code Ann. § 49-1-302(d)(2)(A) (2016). Tennessee Board of Education policy 5.201 in turn requires local school boards to use the evaluations to "inform human capital decisions, including but not limited to individual and group professional development plans, hiring, assignment and promotion, tenure and dismissal, and compensation." Tenn. State Bd. of Educ. Policy Manual, Tennessee Teacher and Principal Evaluation, No. 5.201 (2020).[21]

Here, Director Miles acknowledged that he did not review Mr. Geller's favorable performance evaluation before he decided to transfer him. Director Miles explained he did not do so because the transfer decision was based solely on the fact that Mr. Geller did not have an administrator license, so any evaluation of Mr. Geller's performance was irrelevant.

In some cases, the performance evaluation of a teacher or administrator may be highly relevant to an employment decision. *See, e.g., Elmi v. Cheatham Cnty. Bd. of Educ.*, 546 S.W.3d 630, 644 (Tenn. Ct. App. 2017); *Jones v. Knox Cnty. Bd. of Educ.*, No. E2015-00304-COA-R3-CV, 2015 WL 9290172, at *4 (Tenn. Ct. App. Dec. 21, 2015); *Metro. Nashville Educ. Ass'n v. Metro. Bd. of Pub. Educ.*, No. M2011-02242-COA-R3-CV, 2013 WL 870656, at *8 (Tenn. Ct. App. Mar. 7, 2013), *perm. app. denied*, (Tenn. Mar. 7, 2013). In this case, it was not. Mr. Geller points to no way in which it

---

[20] The evaluation form rated administrators in thirty-eight areas identified as "Tennessee Instructional Leadership Standards (TILS) and Indicators."

[21] Although neither Tennessee Code Annotated section 49-1-302(d)(2)(A) nor Tennessee Board of Education Policy 5.201 explicitly lists transfer as one of the decisions for which evaluations are to be considered, we assume for purposes of this appeal that transfers would be included as to both.

would have made a difference had Director Miles considered his evaluation. Under the facts of this case, given the broad discretion afforded to Director Miles under the statutes, we decline to hold that his failure to consider Mr. Geller's performance evaluation rendered the transfer decision arbitrary or capricious. *Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 314-15.

Finally, Mr. Geller contends Director Miles failed to act in accordance with Board policy 5.115, which requires assignments for the coming school year be made by May 15. In this case, Director Miles' transfer decision was made shortly after the June 28 meeting between Director Miles and Mr. Geller regarding Dr. Nye's letter. Mr. Geller received his new assignment on July 27.

Tennessee Code Annotated section 49-5-401 provides that "[a]ll educators and other school personnel to be employed for the following school year shall be assigned to the several schools by June 15 next preceding the school year for which those persons are employed." Tenn. Code Ann. § 49-5-401 (2016). The Board's policy on personnel assignment provides an earlier deadline of May 15. Henry Cnty Bd. of Educ. Policy Manual, Personnel Assignment/Transfer, No. 5.115 (1999).[22]

The undisputed testimony at trial showed Mr. Geller received his assignment as assistant principal at HCHS for the upcoming school year prior to the May 15 deadline. Director Miles did not find out until June, when he received his copy of Dr. Nye's letter, that Mr. Geller did not hold an administrator license. After that, Director Miles acted promptly to meet with Mr. Geller to discuss Dr. Nye's letter and his licensure. He also acted promptly to make the decision that it was necessary to transfer Mr. Geller in light of the fact that he had no administrator license.

Here, Director Miles did not know until after May 15 that Mr. Geller did not have the licensure necessary for him to undertake the instructional leadership responsibilities deemed essential by both Director Miles and the Board. Director Miles could not act on information he did not yet have. Under Mr. Geller's interpretation, Director Miles was

---

[22] The portion of Board policy 5.115 that addresses the transfer of employees as necessary for the efficient operation of the school system does not include a deadline for such transfers. Given our resolution of this issue, we need not determine whether the May 15 deadline applies to transfers under different factual circumstances. *See Summey v. Monroe Cnty. Dep't of Educ.*, No. E2011-01400-COA-R3-CV, 2012 WL 1926444, at *6-7 (Tenn. Ct. App. May 29, 2012) (court held, in part, that failure to comply with the May 15 deadline for assignment set out in board rules was not applicable to circumstances of transfer).

required to keep Mr. Geller on as assistant principal at HCHS simply because he did not find out about the lack of an administrator license until after May 15.

This Court "will not apply a particular interpretation to a statute if that interpretation would yield an absurd result." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). Under the facts of this case, we decline to hold that Director Miles' failure to transfer Mr. Geller prior to May 15 rendered the transfer decision arbitrary or capricious. *Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 314-15.

As emphasized by this Court in *Lawrence County Education Ass'n v. Lawrence County Board of Education*, judicial review of a school system director's decision to transfer a teacher "must be conducted in light of the broad discretion" given to directors and the presumption the decision was made in good faith. *Id*. Under that standard, we hold Mr. Geller did not meet his burden to prove that Director Miles' decision to transfer him was "not made in good faith and is the product of arbitrary, capricious, or improper conduct." *Id*. at 314.

## CONCLUSION

Mr. Geller has pointed to no provision in the Tenure Act that prevents a school system from establishing instructional leadership by school administrators as a priority. Director Miles' testimony demonstrated that he and the Board had in fact made instructional leadership by administrators a priority for the School System. The 50% Rule mandated that assistant principals must have an administrative license in order to undertake more than 50% responsibilities involving instructional leadership. Absent an administrator license, Mr. Geller was precluded from having assistant principal responsibilities in the upcoming school year that involved more than 50% instructional leadership. This was contrary to the priorities Director Miles and the Board had established for the School System, and Mr. Geller's transfer was "necessary to the efficient operation of the school system." Tenn. Code Ann. § 49-5-510. Under those circumstances, we hold Mr. Geller failed to meet his burden of proving that Director Miles' decision to transfer Mr. Geller was not made in good faith and was arbitrary,

capricious, or improperly motivated. Director Miles did not abuse the broad discretion afforded him under the statutes. We reverse the decision of the Court of Appeals and affirm the trial court's dismissal of Mr. Geller's complaint and entry of a judgment in favor of the Board. The costs of appeal are assessed to Mr. Geller, for which execution may issue if necessary.

_____
HOLLY KIRBY, JUSTICE